**UNITED STATES of America on Behalf of the RURAL ELECTRIFICATION ADMINISTRATION, Appellant,**

v.

**WABASH VALLEY POWER ASSOCIATION, INC., and National Rural Utilities Cooperative Finance Corporation, Appellees.**

**In re WABASH VALLEY POWER ASSOCIATION, INC., Debtor.**

**Nos. IP 93–459 C, IP85–2238–RMV–11.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 15, 1994.

Andrea J. Larry, Dept. of Justice, Civil Div., Washington, DC, Jeffrey L. Hunter, Asst. U.S. Atty., Indianapolis, IN, for appellant United States of America on behalf of the Rural Electrification Admin.

David H. Kleiman, Dann Pecar Newman Talesnick & Kleiman, Indianapolis, IN, Don F. Morton, Parr Richey Obremskey & Morton, c/o Wabash Valley Power Ass'n, Inc., Lebanon, IN, Lee Freeman, Freeman Freeman & Salzman, P.C., Chicago, IL, for appellee Wabash Valley Power Ass'n, Inc.

Wilbur F. Foster, Jr., Milbank, Tweed, Hadley & McCloy, New York City, John J. List, Nat'l Rural Utilities Cooperative Finance Corp., Herndon, VA, for appellee National Rural Utilities Cooperative Finance Corp.

## ENTRY

BARKER, Chief Judge.

This matter is before the Court on appeal from the Bankruptcy Court's March 23, 1993 Order granting the amended motion of the debtor, Wabash Valley Power Association, Inc. ("Wabash"), for authority to substitute pre-chapter 11 debt. The United States of America, on behalf of the Rural Electrification Administration ("REA"), appeals. For the reasons stated below, the Order of the Bankruptcy Court is affirmed.

## I. Background

The debtor, Wabash Valley Power Association, Inc., filed for chapter 11 bankruptcy in May, 1985. The details of this complicated bankruptcy and what led to it are set forth in various published opinions and will not be repeated here. *See, e.g., In re Wabash Val-*

*ley Power Ass'n, Inc.,* 77 B.R. 991 (Bankr. S.D.Ind.1987), *rev'd sub nom. National Rural Utilities Cooperative Finance Corp. v. Wabash Valley Power Ass'n, Inc.,* 111 B.R. 752 (S.D.Ind.1990); *National Rural Utilities Cooperative Finance Corp. v. Public Service Commission of Indiana,* 528 N.E.2d 95 (Ind. App.1988), *aff'd,* 552 N.E.2d 23 (Ind.1990).

REA is Wabash's principal creditor. Pursuant to the Rural Electrification Act of 1936, 7 U.S.C. § 901 *et seq.,* REA guaranteed over 600 million dollars ($600,000,000.00) in loans made by the Federal Financing Bank to Wabash. In 1984 Wabash defaulted on its debt to REA. In May, 1985, Wabash filed for chapter 11 bankruptcy. REA claims that Wabash currently owes REA in excess of one billion dollars ($1,000,000,000.00).

National Rural Utilities Cooperative Finance Corporation ("CFC") is another of Wabash's creditors. In 1980 and 1982 Wabash entered into bond issues guaranteed by CFC. As of February, 1993, the outstanding principal balance of the bonds was about twenty-four million dollars ($24,000,000.00). One of the bonds was accruing interest at the rate of 8⅝%, required semi-annual interest and principal payments, and was scheduled to mature in May 2010. The other bond accrued interest at a variable rate (as of February, 1993, the composite rate was 10.8%), required annual principal payments and semi-annual interest payments, and was scheduled to mature in December 2012.

Wabash executed promissory notes (the "old CFC debt") in favor of CFC in a total amount equal to the total outstanding amount of the bonds. Under the old CFC debt, Wabash was obligated to pay CFC any amounts that CFC paid under CFC's guaranty of the Bonds, whether for redemption or otherwise.

The REA and CFC debt are secured by a joint mortgage covering nearly all of Wabash's assets (the "mortgage"). The terms

of the mortgage require REA approval of any CFC debt substitution. In January, 1993, CFC sent REA a proposal to refinance the old CFC debt with new promissory notes (the "substituted CFC debt"). The interest expense to Wabash under the substituted CFC debt would be at the CFC variable rate, which, as of February, 1993, was 4.75%.[1] This lower interest rate would reduce Wabash's annual debt service cost before final plan confirmation by about 1.2 million dollars ($1,200,000.00). Following final plan confirmation, the lower interest rate payable to CFC would reduce Wabash's annual debt service cost by about $300,000. CFC would also realize substantial savings from the reduced interest rate.

REA was unwilling to approve the necessary lien accommodation to accomplish the CFC refinancing. Wabash then filed its motion for authority to substitute pre-chapter 11 debt, asking authority from the Bankruptcy Court to proceed with the CFC refinancing. Wabash also filed two amendments to its motion, clarifying that only Wabash and CFC—not REA—would benefit from the refinancing, and asserting that the refinancing would not affect the treatment of REA under the debtor's conditionally confirmed plan. Although REA has repeatedly objected to the refinancing itself, REA has not offered any evidence to contest Wabash's assertion that the CFC refinancing will not affect the impact to REA under the conditionally confirmed reorganization plan.[2]

REA instead asserted that the Bankruptcy Court had no authority to allow the refinancing over REA's objections. The Bankruptcy Court held a hearing on Wabash's motion for authority to substitute pre-chapter 11 debt, and Wabash's motion was granted. On appeal, REA argues that the Bankruptcy Court lacked authority to modify REA's right under the mortgage to approve any CFC debt substitution.[3]

---

1. February, 1993, is significant because that is when the Bankruptcy Court held the hearing on the issue currently being appealed.

2. According to REA, the plan which has been conditionally confirmed writes down the REA debt by more than 500 million dollars ($500,-000,000.00). REA has appealed the order conditionally confirming the plan. However, for reasons having nothing to do with judicial economy,

that appeal is being considered separately, by another judge. For the purposes of this appeal, all that is relevant is an analysis of the CFC's refinancing's effect on the REA under the conditionally confirmed plan.

3. This right may be more aptly stated as the right to *refuse* to approve any CFC debt substitution, based on REA's statement in its brief that "REA is unwilling to extend favors to the debtor be-

## II. Standard for Review

The standard which this Court must apply when reviewing decisions of the Bankruptcy Court is set forth in Rule 8013 of the Federal Rules of Bankruptcy Procedure:

> On an appeal the district court or bankruptcy panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses.

Therefore, this Court is required to accept the Bankruptcy Court's findings of fact unless they are clearly erroneous. *In re Excalibur Auto. Corp.*, 859 F.2d 454, 457 n. 3 (7th Cir.1988). However, the Bankruptcy Court's conclusions of law are reviewed de novo. *Id.*

On appeal, REA argues that neither of the provisions cited by the Bankruptcy Court (§§ 105 and 363) authorize the Bankruptcy Court's ruling granting Wabash's motion for authority to substitute pre-chapter 11 debt. The matter of whether the Bankruptcy Code authorizes a bankruptcy court to act in a certain way is fundamentally a question of law; therefore, the Bankruptcy Court's ruling granting Wabash's motion for authority to substitute pre-chapter 11 debt will be reviewed de novo.

## III. Discussion

■ REA argues that § 105 does not authorize the Bankruptcy Court to modify REA's rights under the mortgage. Section 105 authorizes a bankruptcy court to fashion such orders as are necessary or appropriate to further the purposes of the substantive provisions of the Bankruptcy Code:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

11 U.S.C. § 105(a). The authority under § 105 is not unlimited:

> [T]he equitable powers enumerated in section 105(a) are not unrestricted. They should be exercised only where it is necessary or appropriate to implement the provisions of the Bankruptcy Code or where equity and substantial justice requires.

*In re Dunckle Associates, Inc.*, 19 B.R. 481 (Bankr.E.D.Pa.1982) (citations omitted).

REA contends that the Bankruptcy Court's order was not authorized by § 105 because, REA argues, the courts consistently have refused to allow § 105 to be used as the basis for modifying or expanding contract rights. However, none of the cases cited by REA stand for such a broad proposition. In fact, REA does not cite any cases in which a court was found not to have the power to preclude a creditor from exercising a contract right, where exercising that contract right would be a benefit to the debtor and cause no detriment (outside of the abstract loss of the right to exercise that contract right) to the creditor.

■ Contrary to REA's position, bankruptcy courts have the authority in § 105 to preclude a creditor from exercising a contract right. *See, e.g., In re Cahokia Downs, Inc.*, 5 B.R. 529, 531 (Bankr.S.D.Ill.1980) (enjoining creditor from exercising contractual right to terminate contract); *In re Amber Lingerie, Inc.*, 30 B.R. 736, 737 (Bankr. S.D.N.Y.1983) (same).[4] It is perfectly acceptable for a bankruptcy court to take such

---

cause the debtor singlemindedly has pursued its own self-interest at REA's expense." Appellant's Brief at 6. Similarly, at the hearing the Bankruptcy Court held on this issue, counsel for REA stated, "What has Wabash ever done for us? Why should we do this? We're getting nothing from them, nothing. They need our approval, and we're not going to give it, and that's—as far as REA's concerned, that's the end of the [s]tory." Transcript of Feb. 25, 1993 hearing at 57–58.

**4.** Long before the enactment of § 105, the Seventh Circuit commented that the Bankruptcy Code necessitated the modification of contract rights: "All loans were made and all credit extended with the knowledge that the power to enact [bankruptcy] laws existed and application of such legislation might alter the contractual rights of the creditor. To illustrate: A discharge in bankruptcy is the goal of the debtor in the ordinary bankruptcy proceedings. Yet, a discharge of debts necessarily abridges the creditor's contract and his rights thereunder." *First Nat'l Bank of Chicago v. Prima Co.*, 88 F.2d 785, 788 (7th Cir.1937).

an action, so long as it furthers the purposes of a substantive provision of the Bankruptcy Code. *Id.*

Although REA finds the Bankruptcy Court's citation to 11 U.S.C. § 363 in the instant case to be "puzzling," § 363 is a substantive provision of the Bankruptcy Code which is furthered by the Bankruptcy Court's Order. Section 363 provides the procedure by which a debtor business may use sell, or lease property or cash collateral of that business.[5] 11 U.S.C. § 363(b)(1). The underlying policy of § 363 is protection of the debtor. *See In re Bolin Oil Co.*, 51 B.R. 936, 939 (Bankr.N.D.Ohio 1985).

In order for the debtor to use, sell, or lease cash collateral, the debtor needs to have *either* the consent of all creditors with an interest in the cash collateral *or* court authorization after notice and a hearing. 11 U.S.C. § 363(c)(2). The promissory notes for the old CFC debt constitute cash collateral of the debtor business.[6] Therefore, pursuant to § 363, Wabash did not need REA's consent to proceed with the refinancing, so long as Wabash received court authorization after notice and a hearing.[7]

The Bankruptcy Court, without error, determined that the relief requested would benefit Wabash by lowering its debt service obligations. Given these factors, pursuant to §§ 105 and 363, the Bankruptcy Court correctly granted Wabash's motion to substitute the old CFC debt.

### IV. Conclusion

For the above stated reasons, the Bankruptcy Court's March 23, 1993 Order granting the amended motion of Wabash Valley Power Association, Inc., for authority to substitute pre-chapter 11 debt is affirmed.

It is so ORDERED.

---

5. Although § 363 refers only to actions of the trustee, 11 U.S.C. § 1304 clarifies that a debtor business may also take the same actions.

6. "Cash collateral" is defined within 11 U.S.C. § 363 as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest...."

## JUDGMENT

In accord with the Court's entry in this matter, judgment is hereby entered for appellee, Wabash Valley Power Association, Inc., and against appellant, United States of America on behalf of Rural Electrification Administration. The ruling of the Bankruptcy Court on the authority of the debtor to substitute pre-chapter 11 debt is HEREBY AFFIRMED and it is ORDERED that the requested debt substitution take place as authorized by the Bankruptcy Court.

It is so ORDERED.

---

7. This would also be the case if the promissory notes were determined to be property of the estate rather than cash collateral. With respect to property being used, sold, or leased outside of the ordinary course of business, the debtor may do so, with the court's permission, after notice and a hearing. 11 U.S.C. § 363(b)(1). The Bankruptcy Court's hearing and determination in the instant case, therefore, would suffice as an authorization to use, sell, or lease property, as well as cash collateral, under § 363.